622 So.2d 51 (1993)
William A. STEWART, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 92-1859.
District Court of Appeal of Florida, Fifth District.
July 16, 1993.
*52 Jeffrey L. Dees of Dunn, Abraham, Swain & Dees, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Anthony J. Golden, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
William Stewart, Jr. appeals from his conviction of one count of second degree murder and his corresponding 40 year departure sentence. We reverse and remand for retrial because the cumulative effect of the erroneous evidentiary rulings and improper prosecutorial comment deprived the defendant of a fair trial.
The body of Wendy Townsend, a 15 year old runaway from New Castle, Delaware, was found floating in Lake Butler on December 22, 1987, with sandbags tied by socks to her neck and ankles. An autopsy revealed that the likely cause of death was manual strangulation. The body was not identified until late 1990, when Patty White, a former girlfriend of the defendant, tipped police officers.
On December 5, 1990, Volusia County sheriffs and New Castle County police picked up the defendant's 21 year old wife, Tracy Derby Stewart, and the defendant's 20 year old son, Richard Stewart, for questioning. At that time, Tracy gave "version I" of the murder, in which she implicated only Richard and not the defendant. In version I, Tracy said that on December 2, 1987, when she was 17 years old and pregnant with the defendant's child, she and the defendant left Delaware with the defendant's son, Richard, and Richard's 15 year old girlfriend, Wendy Townsend, to go to Mexico. The group went to Mexico so that the defendant could get a divorce and marry Tracy. When the defendant was unsuccessful in getting the divorce in Mexico, the group decided to return to Delaware via Florida so that the defendant could visit his sister in Sanford and could show Tracy some lakefront property on which he wanted to build. On the way to Florida, Wendy stated that she was having trouble with Richard and that her vaginal area was sore. Wendy also told Tracy that she was pregnant. At a rest stop, Richard picked up several sandbags and put them in the car, stating he wished to build sand castles.
Version I continued with Tracy's description of the group's arrival at Lake Butler. Tracy said that while she and the defendant stayed by the car, Richard and Wendy walked off by themselves. Richard returned to the car without Wendy, retrieved some socks, left, and returned soaking wet. He said a gator was going to eat Wendy. Richard threatened Tracy that if she said anything, she would meet the same fate. On the way back to Delaware, the three of them agreed to say that they had dropped Wendy off at the mall before heading to Mexico. Tracy was picked up by the authorities in Maryland and returned to her mother. The defendant returned to Delaware and rejoined another pregnant girlfriend, Patty White. After the defendant and Patty broke up, the defendant returned to Tracy and moved into Tracy's mother's home with Tracy. The defendant and Tracy were married and had a second child together. Richard returned to his mother's house and rejoined his other 15 year old girlfriend, who already had a child by Richard.
After hearing Tracy's version I of the murder, the investigators told Tracy that they did not believe her and that she needed to think of herself and her two children. Tracy then expressed her fear that the defendant may have helped Richard hide the body. However, at this point, Tracy did not otherwise inculpate the defendant.
In contrast to Tracy's version I, Richard's statement to the investigators placed the blame for the murder solely on the defendant. Richard testified that the defendant had been the one to put the sandbags in the car and that the defendant had stated that Wendy "had to go." At the lake, the defendant, acting alone, suddenly grabbed Wendy and tried to break her *53 neck. When that proved unsuccessful, the defendant began to choke Wendy, holding her head under water. At his father's direction, Richard got the sandbags and socks out of the car and tied them onto the body.
After hearing Tracy's and Richard's stories of the murder, the investigators located the defendant, who was then 38 years old, in a hospital in Delaware. The defendant denied that Wendy had gone on a trip to Mexico with the group and refused to answer any questions. The defendant and Richard were arrested and were brought to Florida in December 1990.
In March 1991, the defense counsel scheduled Tracy's deposition in Delaware. The night before the scheduled deposition, State Attorney John Tanner and a detective from Delaware paid a surprise visit to Tracy at her home in Delaware. According to Tracy, Tanner told her he knew she was lying and if she continued to lie, he would charge her and put her in jail. Tracy also said that the Delaware detective told her that her children, then ages 2 years and under 1 year, would go to foster care. They asked her to go to the New Castle County Police Station and give a statement before giving her deposition. According to Tracy, Tanner again approached her just before the start of the deposition the next day, and he told her that he knew she was lying and that he intended to arrest her and charge her. At the deposition, Tracy asserted her Fifth Amendment privilege against self-incrimination and refused to testify.
The State then scheduled Tracy for a deposition in Florida. Tracy was ordered by a Delaware court to go to Florida. When Tracy again refused to testify, she was jailed for contempt. However, after four days in jail, Tracy agreed to give her deposition. At this deposition on March 16, 1991, Tracy gave "version II" of the murder, which she also testified to at the trial. During her trial testimony, Tracy admitted that because she had been trying to shield her husband, the defendant, she had made up parts of version I. Tracy's version II implicated both Richard and the defendant in the murder. In version II, Tracy stated that once the group arrived at Lake Butler, all four of them got out of the car. The defendant suddenly grabbed Wendy, and Richard began trying to stab Wendy with a screwdriver. Tracy sat on the ground behind the car and did not watch. Richard and the defendant then took Wendy toward the lake. Richard returned to the car, tied some socks together, and returned to the lake. Tracy then walked toward the lake, where she saw Wendy on the ground with the defendant and Richard stooped over her. Tracy returned to the car. About 15 minutes later, the defendant and Richard returned and they drove away.
Pursuant to a plea agreement, Richard also testified at the trial against his father, the defendant. Richard had previously pled guilty to second degree murder with a maximum of 25 years of imprisonment. Richard's trial testimony was essentially the same as the statement that he gave investigators in 1990, with the exception that at the trial, he admitted that he did not get along with Tracy. During his trial testimony, Richard also explained that at the Mexico border, the group was stopped and questioned by the border patrol. At that time, the defendant became concerned because he had two runaway minors in the car and therefore decided to return to Delaware via Florida to avoid detection. Richard further testified that the group was tired of being cooped up in the car together.
Although Tracy and Richard were the key witnesses against the defendant at the trial, the State also called Patty White, the defendant's other girlfriend at the time of the murder, to fill in the gaps of the story. Patty testified that she and the defendant went to Volusia County, Florida in August 1987 looking at property. She was pregnant and the couple was planning to get married and return to Florida in early December of that year. However, they did not take the December trip together. When the defendant reappeared in late December, he explained his absence by telling Patty that he and Richard had gone to Mexico to get divorce papers. Patty and *54 the defendant then went to California together. The defendant told Patty that he was in trouble because of Tracy. On the trip home from California, the defendant stated that he wanted Tracy dead. When they got back to Delaware, Patty and the defendant broke up. Patty later pieced together bits of the story regarding Wendy's disappearance and then phoned the authorities.
We begin our discussion of the trial errors, which we hold deprived the defendant of a fair trial and require reversal, with the improper admission of the testimony of Edward Lang, the defendant's brother-in-law. Over objection, Edward testified that sometime in 1988 or 1989, the defendant and Tracy were at his house drinking alcohol, when the defendant said that he did not want to drive home and that he was going to call Richard. The defendant and the person on the other end of the telephone call got into an argument and the defendant then stated, in effect, "Do you remember what happened to someone else, do you want it to happen to you?" On cross-examination, Edward admitted that he did not know when the call occurred, other than "approximately between 1988 and 1989" and that he did not know who was on the other end of the conversation.
On appeal, the defendant contends that Edward's testimony improperly required the jury to speculate that the defendant (1) was talking to Richard Stewart and (2) was referring to Wendy's murder. The defendant also contends that the passage of time between the murder and the defendant's telephone conversation made the conversation too remote to be legally relevant. See Griswold v. State, 77 Fla. 505, 82 So. 44 (1919) (holding that it is reversible error to admit evidence that is misleading or confusing and so remote as to be legally irrelevant). We agree with the defendant's contentions regarding the inadmissibility of Edward's testimony. While this error alone would not have caused us to reverse the defendant's conviction, it, taken with the other errors discussed below, compelled us to our conclusion.
The next trial error involved the improper exclusion of the testimony of Brian Michaels, a former cell block mate of Richard and the defendant. On proffer, Brian testified that Richard was very hyperactive at times, would get depressed at times, and was "very, very neurotic." Richard could not sit still for very long, "was very quick to anger," and "had a very quick temper." Brian further testified that Richard would get medicine in the evening and then would calm down.
The defense counsel argued below that Brian's testimony was relevant to Richard's nature and his inability to handle confined spaces. However, the trial court ruled that the testimony was inadmissible. On appeal, the defendant points to the fact that the four members of the group were confined in a small car for five days before the murder occurred and contends that Richard's reaction to small spaces was relevant to the defense's theory that Richard, acting alone, had murdered Wendy.
In Gardner v. State, 480 So.2d 91 (Fla. 1985), one of the claims presented on appeal was that the trial court erred in allowing a police officer to testify about the character and personality of the defendant's accomplice to a murder. The supreme court disagreed, stating:
A lay witness may give opinion testimony so long as the opinion testimony does not mislead the trier of fact. § 90.701, Fla. Stat. (1983). The police officer who testified about Hadley's character and personality based that opinion on five hours of direct observation and subsequent contacts with Hadley. The trial court did not err in finding that the officer had a sufficient basis for his opinion.
Id. at 93. Pursuant to Gardner, we find that Brian's testimony showing Richard's inability to handle confined spaces should have been admitted.
The next evidentiary ruling error concerned the incorrect exclusion of certain testimony of the defendant's sister, Judy Knorr. During the cross-examination of Tracy by the defense counsel, Tracy denied that she had told Judy that "they" were telling her that she could be charged with *55 second degree murder. Tracy also denied telling Judy that "they" said if Richard killed Wendy because of Tracy, she would be charged with second degree murder. The defense counsel then called Judy Knorr to testify. When the defense counsel asked a question regarding what Tracy had told Judy, the State objected on hearsay grounds. On proffer, Judy testified that Tracy had told her the following:
JUDY KNORR: She said you are not going to believe what they told me. They told me if Richard gets on the stand and says that he did this under my spell, that I'll be charged with second degree murder.
PROSECUTOR: Did that make an impact on you when she said that?
JUDY KNORR: Yes.
PROSECUTOR: And did she use the words second degree murder?
JUDY KNORR: Yes, sir.
PROSECUTOR: Did she ever specify any more about who said that to her?
JUDY KNORR: She never said who they were.
The defense counsel argued below that he was offering Judy's testimony to prove a motivation on Tracy's part to change her testimony. The trial court expressed concern that no evidence showed to whom "they" referred. Although the defense counsel had demonstrated through other evidence that Tracy was under considerable pressure from the State, the trial court stated that unless there was some evidence of who "they" were, it would have to sustain the State's objection.
On appeal, the defendant argues that Judy's testimony was evidence of the pressure that Tracy was under to change her testimony, and thus should have been admitted. Tracy's alleged statements to Judy were made less than two days prior to Tracy's incarceration for contempt for her refusal to give the State her deposition. Regardless of to whom "they" referred, the defendant argues that the statements show bias or motive on Tracy's part to change her testimony to protect herself and her children, and therefore were admissible to show motive.
In support of his argument, the defendant cites to Dukes v. State, 442 So.2d 316 (Fla. 2d DCA 1983), where the Second District found reversible error in the preclusion of testimony from defense witnesses that corroborated the defendant's assertion that the state's witness had motivation to lie about the defendant's alleged confession. The court in Dukes found that the testimony was relevant because it tended to show bias or motive bearing on the credibility of the state's witness. The court also rejected the state's argument on appeal that the error was harmless because it was cumulative to other testimony and further noted that the credibility of witnesses on both sides was critical because the case against the defendant was not overwhelming.
Sub judice, both sides hit hard on the fact that Tracy's story had changed dramatically. The defense counsel intimated that the change occurred because State Attorney Tanner had forced Tracy to do so to save herself and her children. The State explained Tracy's switch as her response to Tanner's admonitions to "tell the whole truth." Judy's testimony that Tracy said that "they" had told her that she could be charged with second degree murder was relevant to the issue of Tracy's credibility and motive to change her testimony, and thus, its exclusion was error. As in Dukes, even though Judy's testimony was cumulative to other testimony that Tracy was lying to save herself, this case turned on the credibility of the two key witnesses. As a result, we find that the trial court's exclusion of part of Judy's testimony based on the fact that no one knew to whom "they" referred was incorrect because the statement was not offered for the truth of the matter asserted, but rather to demonstrate the motive for Tracy's story change.
The final erroneous evidentiary ruling occurred during Carol Dager's testimony. The defense counsel called Carol, a longtime friend of the defendant, to testify. Carol testified that Tracy called her from jail and said the State "was after the defendant." *56 Tracy also told Carol that she was angry that the defendant had laughed when the judge told her she was going to jail for contempt of court. The defense counsel then asked, "Did she indicate whether the State  prior to her giving her deposition, did she indicate whether the State told her what would happen to her husband if she gave testimony?" Carol responded, "She was relieved. She  before she would end up giving her ultimate testimony, she wanted to know what the outcome would be on Bill and she was relieved that the worst that could happen, as the State has said  ." At that point, the State objected, which the trial court sustained.
On appeal, the defendant correctly contends that Carol's testimony was relevant to bias, motive, or interest on Tracy's part to change her testimony and that if the jury had heard the testimony, it may have concluded that Tracy changed her testimony to protect herself after she was satisfied that no harm would come to the defendant. Therefore, we find the same rationale for admitting Judy Knorr's testimony applies to Carol Dager and the defense counsel should have been permitted to use Carol's testimony to impeach Tracy's credibility by showing a motive by Tracy to change her story. If the jury had heard the testimony of Judy Knorr and Carol Dager, the jury may have completely disregarded Tracy's trial testimony.
Finally, and most egregious of all the trial errors, was the following improper comment made by the prosecutor in closing argument:
Now, during the next phase we'll get into more of the proof, the discussion of why he actually did it, but all we have to prove  you can determine 
The defense counsel moved for a mistrial on the grounds that the prosecutor was clearly telling the jury that he had other evidence which was outside of the evidence at trial concerning why the defendant committed the crime and that the prosecutor would present it later after conviction. The prosecutor protested that he had not intended to intimate that other evidence existed, but rather, that he was trying to tell the jury that they only needed to find that the defendant was an aider and abettor to the murder and that the State did not have to prove that the defendant was the actual killer in this phase of the trial. The trial court instructed the jury to disregard the prosecutor's comments about the "so called other evidence or the penalty phase that may or may not follow this proceeding. You are to decide this case based solely on the evidence that you've heard in court over the last few days and on nothing else."
The prosecutor's statement clearly suggests that the State had additional evidence and proof of the defendant's guilt that it had not provided to the jury, and the curative instruction did little to dispel the suggestion.[1] In Thompson v. State, 318 So.2d 549 (Fla. 4th DCA 1975), cert. denied, 333 So.2d 465 (Fla. 1976), the appellate court reversed a close case for new trial where the prosecutor stated in closing argument that he had other witnesses who could have testified against the defendant, but had chosen not to call them. The court noted that the outcome of the case hinged on the credibility of a single state witness and the defendant. The Thompson court reasoned:
[I]t has consistently been held to be reversible error for the prosecutor to express his belief in the guilt of the accused, ... or the credibility of a key witness, ... where doing so implies that he does have additional knowledge or information about the case which has not been disclosed to the jury.
"... the inquiry should be whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt." McMillian v. United States, [363 F.2d 165 (5th Cir.1966)] supra, at 169.

*57 Nothing as subtle as an expression of belief in guilt implying access to additional evidence occurred in the case at bar. Instead, the prosecutor here represented outright to the jury that he had additional evidence of appellant's guilt which he simply saw no need to present to them. This representation was highly improper and prejudicial, especially in the context of this case.
Id. at 551-52 (citations omitted). See also United States v. Rodriguez, 585 F.2d 1234 (5th Cir.1978); Jones v. State, 449 So.2d 313 (Fla. 5th DCA), review denied, 456 So.2d 1182 (Fla. 1984); Williamson v. State, 459 So.2d 1125 (Fla. 3d DCA 1984); Salazar-Rodriguez v. State, 436 So.2d 269 (Fla. 3d DCA 1983); Richardson v. State, 335 So.2d 835 (Fla. 4th DCA 1976). Likewise, in the instant case, we hold that the prosecutor's argument was improper and prejudicial.
Considering the whole of the evidence, it cannot be said that the cumulative effect of the errors in this case was harmless. The admission of Edward Lang's testimony concerning a conversation that he overheard, the exclusion of Brian Michaels' testimony showing that Richard was unable to handle confined spaces, the exclusion of Judy Knorr's and Carol Dager's testimony supporting the defendant's theory that Tracy's first version was correct and that her second version at trial was false, and the prosecutor's comment during closing argument that the State had other proof that the defendant committed the murder were errors which, when considered in the totality, may have affected the jury's verdict. The jury did not convict the defendant of first degree murder as charged, but rather of the lesser included offense of second degree murder. Without the asserted errors, we cannot say that the verdict would have been the same. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Accordingly, we conclude that the cumulative effect of the trial errors in this case requires reversal.
REVERSED and REMANDED.
GOSHORN, and THOMPSON, JJ., concur.
HARRIS, C.J., concurs specially, with opinion.
HARRIS, Chief Justice, concurring specially:
I agree that the prosecutor's remarks regarding other "proof" requires reversal.
NOTES
[1] The State never told the jury that it had no further evidence, nor did the court's curative instruction inform the jury that all of the evidence in the case had been given to them.