640 So.2d 1127 (1994)
Walter T. TAYLOR, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 91-860.
District Court of Appeal of Florida, First District.
May 25, 1994.
Rehearing Denied August 23, 1994.
*1130 Andrew Thomas, Quincy, for appellant.
Robert A. Butterworth, Atty. Gen. and Gypsy Bailey, Asst. Atty. Gen., for appellee.
JOANOS, Judge.
This appeal is from a jury verdict finding appellant guilty of two counts of first-degree murder, and the imposition of consecutive life sentences for those convictions. Appellant seeks review of three issues: (1) the trial court's denial of his motions for mistrial based on prosecutorial misconduct, (2) the trial court's admission into evidence of cumulative photographic and videotape evidence, and (3) the trial court's denial of his motions to suppress statements. On cross-appeal, the state contends the trial court erred in refusing to instruct the jury on the underlying felonies of kidnapping and aggravated child abuse in the instructions on first-degree felony murder of the child, and the trial court abused its discretion in excluding evidence of the victim's state of mind. We reverse and remand for new trial.
In September 1987, appellant was indicted for first-degree murder for the deaths of Paula Smits and her 3 1/2-year old daughter, Amanda. The Smits were Navy dependents who resided in Jacksonville, Florida. Appellant was a member of the U.S. Navy; he was on board the U.S.S. Stark in the Persian Gulf on May 17, 1987, when it was struck by two missiles fired by an Iraqui fighter plane. There was evidence at trial that appellant was traumatized by the missile attack and its *1131 aftermath, and suffered great emotional distress.
The ship docked at Mayport on August 5, 1987. David Peterson, a former shipmate, and his wife, met the ship and invited appellant to spend some time with them. Appellant and the Petersons spent the next two days in a variety of activities, most of which were accompanied by the consumption of considerable quantities of alcohol. On Friday, August 7, 1987, appellant had several contacts with Paula Smits, a friend and neighbor of the Petersons.
On Saturday, August 8, 1987, appellant was not in the apartment when Peterson arose at 7:15 a.m. Appellant returned to the apartment at 10:00 a.m., and asked Peterson to drive him to the ship so he could get more money. During the drive, appellant said he had gone to a nearby store to call his mother. When he learned she was upset that he was not going home, he decided to go home to Virginia. After the stop at the ship, Peterson drove appellant to cash a check, and then drove him to the airport. Peterson knew appellant was due to report to the ship Monday morning, August 10, 1987, and tried to persuade him not to go.
On Monday morning, August 10, 1987, the bodies of Paula and Amanda Smits were discovered in the Smits' apartment. Both had been bludgeoned to death. Appellant became a suspect in the deaths after Jacksonville sheriff's investigators talked with the Petersons. Sergeant Warren called the Naval Investigative Service (NIS), then met with NIS investigators to discuss the case. On Tuesday, August 11, 1987, two NIS investigators flew to Virginia. On Wednesday, August 12, 1987, an NIS agent discovered appellant in a wooded area behind the apartment complex in which his sister lived. The NIS agents arrested appellant for desertion, and then questioned him about the homicides.
During the questioning, appellant gave three versions of his activities after he and Peterson returned to the Petersons' apartment at 4:00 a.m. on August 8, 1987. First, appellant said he went to Paula Smits' apartment to use her telephone to call his sister, and then walked until 10:30 a.m. The NIS agent told appellant that evidence at the apartment, including evidence indicating that Paula Smits had had recent sexual intercourse, contradicted his story. Appellant then told the NIS agent that he engaged in consensual sex with Paula Smits, assured her that her husband would never know, and left. The NIS agent advised appellant that he did not believe him, and urged appellant to explain what went wrong. Appellant gave a third statement, in which he said he and Smits had consensual sex, but Smits continued to worry that her husband would learn what happened. When Smits announced her intent to call the police and allege rape, appellant tried to render her unconscious with a headlock. Smits broke away, and appellant grabbed a hammer from an open tool box, intending to knock her out with it. Paula Smits was holding the child as appellant swung the hammer, and the hammer struck the child. When appellant swung a second time, the hammer again struck the child and she fell to the floor. With his next swing, appellant struck Paula Smits, but was unable to knock her out. He attempted to tie her, and struck her several more times as she continued to yell. Appellant told the NIS agent that he put a sheet over Paula Smits, became ill and vomited several times, then called the airlines and made a reservation on a flight to Roanoke, Virginia.
Appellant advised the NIS agent that both Paula Smits and the child were breathing when he left, and although he knew he had hurt Paula, "he thought for sure that she would live." In response to the NIS agent's question, appellant indicated everything had gone wrong. The agent said that at that point, appellant's color changed and he began shaking. At the agent's request, and with prompting from the agent's notes, appellant prepared a written statement of his account of the homicides. The following day, the NIS agents returned appellant to Jacksonville, and placed him in the custody of the Sheriff's Department. Appellant was reinterviewed, and gave substantially the same statement he had given to the NIS agent in Virginia.
Appellant filed a motion to suppress statements, admissions, and confessions, and a *1132 hearing took place. On September 26, 1989, the trial judge issued an order denying appellant's motion to suppress. Subsequently, the original trial judge recused himself due to pre-trial publicity involving the judge's skepticism with regard to the validity of post-traumatic stress disorder as a legal defense. After reviewing the suppression hearing transcript, the successor judge adopted the prior ruling on the suppression question. The motions to suppress were renewed unsuccessfully during trial.
More than three years elapsed between commission of the crimes and the trial. The delay was caused in part because appellant twice was found incompetent to proceed. Later, he attempted suicide. The case received considerable media attention, and gave rise to numerous motions in limine and the issuance of a partial "gag" order, after the media reported that prosecutors had commented that appellant was manipulative and they suspected his motives.
Appellant asserted a defense of insanity. During the jury selection process, several prospective jurors expressed views that an insanity defense is a "cop-out." In his opening statement, the prosecutor advised the jurors they would hear testimony from defense experts as to whether appellant was temporarily insane when he committed the crimes. The prosecutor told jurors they also would hear from two psychiatrists who were appointed by the judge to examine appellant, and to make an objective determination as to whether appellant actually was insane at the time of the offense. Next, the prosecutor advised the jurors that at the close of the evidence, they would be asked to decide whether appellant "was temporarily insane, or whether the insanity defense in this case is a copout."[1] Defense counsel objected. During the bench conference, defense counsel argued the impropriety of the prosecutor's remark, observed that a motion in limine had been filed to preclude the state from denigrating the insanity defense, and reminded the trial court of the opinions expressed by prospective jurors that insanity is not a legitimate defense. Counsel asked for a curative instruction, and then moved for a mistrial. The trial court concluded a curative instruction would focus attention on the remark, and denied both motions.
During the course of the trial, testimony elicited from state witnesses and demonstrative evidence used by the state occasioned other defense objections, requests for curative instructions, and motions for mistrial. Among other things, a state expert opined that questions regarding mental competency were used by attorneys as a "trick" or delaying tactic. In the course of questions about the possible cause for appellant's alleged emotional instability, another state expert remarked gratuitously that appellant's father was in prison. In addition to such testimonial evidence, over defense objection, the trial court permitted the medical examiner to use clay heads to describe the impact and nature of the wounds that caused death, and permitted the state to use a young woman of the same height, weight, and general features and coloring as Paula Smits as a surrogate victim. As part of the state's case, the surrogate donned a blue nightgown worn by Paula Smits prior to her death.[2] Eight photographs of the victims' bodies were introduced into evidence, and a videotape of the crime scene was shown to the jurors without audio. During closing argument, the prosecutor banged on a table with the hammer used as *1133 the murder weapon, ostensibly to demonstrate the force of the blows upon the victims. Also during closing argument, the prosecutor speculated that the child's last words might have been, "Don't hurt my Mommy any more." In each of these instances, the defense objected, and moved for curative instructions and for mistrial. In a few instances, the trial court gave cautionary instructions, but denied all the motions for mistrial.
The first issue concerns allegations of prosecutorial misconduct with respect to (1) the prosecutor's comment in opening statement that appellant's assertion of the insanity defense was a "cop-out;" (2) the prosecutor's vouching for the credibility of the state's experts; (3) the prosecutor's circumvention of pre-trial rulings on the admissibility of evidence, by eliciting, among other things, testimony that appellant's father was in prison; (4) the prosecutor's use of the surrogate victim and clay heads as demonstrative evidence; (5) the prosecutor's act of striking a table with the hammer used as the murder weapon during closing argument; and (6) the prosecutor's speculation as to the child's last words during closing argument. Appellant contends the conduct of the prosecution throughout the trial deprived him of a fair determination of the question of his sanity at the time of the commission of the offenses. We agree.
A trial court's rulings with regard to the relevancy and admissibility of evidence, and rulings concerning prosecutorial comments, are subject to an abuse of discretion standard of review. See Durocher v. State, 596 So.2d 997, 1000 (Fla. 1992); Howard v. State, 616 So.2d 484, 485 (Fla. 1st DCA 1993). Improper prosecutorial comment is subject to a harmless error analysis, and will give rise to reversal of a conviction only if the comment is so prejudicial that it vitiates the entire trial. King v. State, 623 So.2d 486 (Fla. 1993); Watts v. State, 593 So.2d 198 (Fla.), cert. denied, ___ U.S. ___, 112 S.Ct. 3006, 120 L.Ed.2d 881 (1992). "The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state." State v. DiGuilio, 491 So.2d 1129, 1138-1139 (Fla. 1986).
A prosecutor is precluded from any comment intended to discredit the insanity defense as a legal defense to a charge of murder. Such comment is deemed reversible error, whether in "the form of cross-examination, closing argument, or any other remark to the jury." Garron v. State, 528 So.2d 353, 357 (Fla. 1988). See also Riley v. State, 560 So.2d 279, 280 (Fla. 3d DCA 1990) ("A prosecutor may not ridicule a defendant or his theory of defense").
The insanity defense was attacked in Rosso v. State, 505 So.2d 611 (Fla. 3d DCA 1987), on facts analogous to the factual circumstances of the instant case. Rosso offered testimony of two psychiatrists that she was legally insane; the prosecution presented testimony of two psychiatrists that she was sane at all times. In his opening statement, the prosecutor termed Rosso's insanity defense an attempt to evade responsibility for her acts. A motion for mistrial was denied, but a curative instruction was attempted. 505 So.2d at 612. The prosecutor again belittled the insanity defense in closing argument. The court held the prosecutor's comments in opening and closing statements were fairly susceptible of interpretation by the jury as a comment on Rosso's failure to testify through invocation of the insanity defense. The court further found the remarks were directed specifically to Rosso's personal insanity defense. Based on the conflicting expert opinions regarding Rosso's sanity, the court deemed the evidence of her sanity was equivocal and far from overwhelming. Concluding that the prosecutor's remarks impacted upon Rosso's right to a fair trial, the court reversed and remanded for a new trial. 505 So.2d at 616.
In the instant case, as in Rosso and Garron, appellant's defense was insanity, and the issue of his sanity was the only question for the jurors' determination. The prosecutor's opening statement that the jurors would have to decide whether the insanity defense was a "cop-out" in this case is somewhat similar to the statement disapproved in Rosso. Further, the evidence of appellant's sanity was not overwhelming. Prior to trial, he was twice determined to be incompetent, and *1134 was committed to the state hospital. Two defense psychiatrists opined that he was legally insane; two court-appointed psychiatrists opined that he was sane at all times. However, during the penalty phase, all experts agreed that appellant was suffering from post-traumatic stress disorder. In view of the expressions of doubt as to the validity of the insanity defense which occurred during jury selection, and the nature of the evidence of appellant's sanity, we conclude the state failed to meet its burden to show there is no reasonable possibility that the "cop-out" comment together with the other prosecutorial improprieties affected the verdict.
We recognize that considerable public discussion exists in regard to the manner in which mental illness should be treated in criminal trial proceedings. There is constant and continuous media attention given to the subject. However, at this point in history, the law in Florida is clear that the defense of insanity is not only available, but should be accorded to a defendant in a completely fair manner. The atmosphere of the trial proceeding must be kept free of any innuendo that the insanity defense is not fully accredited by the courts of our state. Until the legislature or some higher court directs us otherwise, we are constrained to see that this is done.
In a similar vein, it is improper for a prosecutor to attempt to evade or to circumvent a trial court's rulings by asking inappropriate questions of witnesses, thereby inferring information to the jury which previously was ruled inadmissible. Keen v. State, 504 So.2d 396, 401 (Fla. 1987).
Another area of difficulty during the trial of this case concerns the state's use of demonstrative evidence. Demonstrative exhibits may be used at trial as an aid to the jury's understanding, "but only if the exhibits constitute an accurate and reasonable reproduction of the object involved." Alston v. Shiver, 105 So.2d 785 (Fla. 1958); Brown v. State, 550 So.2d 527, 528 (Fla. 1st DCA 1989), review denied, 560 So.2d 232 (Fla. 1990).
We conclude the use of demonstrative exhibits in this case exceeded the standard contemplated in Brown. There was no dispute as to the cause of death or the number of blows struck. The nature of the demonstration, and the distinctly feminine appearance of the clay heads used by the medical examiner to explain the blows, was certain to evoke an emotional response in the minds of the jurors, on a matter that had little or no bearing on the question for the jury, i.e., the issue of appellant's sanity at the time of the offense.
The use of the surrogate victim is even more troubling. The surrogate resembled Paula Smits, not just in size, but in coloring and facial features as well. The surrogate donned Paula Smits' blue nightgown before the jurors. Any possible relevancy between the victim's nightgown and the sanity issue is tenuous at best,[3] and any probative value the demonstration could have had was outweighed by the prejudicial impact of this appeal to the emotions of the jurors.
Another area of concern involves serious improprieties in connection with closing argument. It is well settled that closing argument "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant." King, 623 So.2d at 488, quoting Bertolotti v. State, 476 So.2d 130, 134 (Fla. 1985). See also Stewart v. State, 622 So.2d 51 (Fla. 5th DCA 1993) (murder conviction reversed for retrial due to cumulative effect of erroneous evidentiary rulings and improper prosecutorial comment which deprived defendant of a fair trial); Landry v. State, 620 So.2d 1099 (Fla. 4th DCA 1993) (conviction reversed due to cumulative effect of closing argument "peppered with improper argument").
In this case, the prosecutor's act of striking a table with the murder weapon and his conjecture concerning the child's dying *1135 words were harmful error within the contemplation of King and Bertolotti. The activities were designed to evoke an emotional response to the crimes or to the defendant, and fall outside the realm of proper argument.
We conclude the cumulative effect of the errors with respect to the prosecutor's opening statement and closing argument were harmful within the contemplation of State v. DiGuilio, 491 So.2d 1129, 1138-1139 (Fla. 1986). These errors are even more egregious when viewed in conjunction with the difficulty in selecting jurors who held no bias toward the insanity defense, the use of questions designed to elicit inappropriate responses, and the use of emotionally-charged demonstrative exhibits. The cumulative effect of the prosecutorial misconduct in this case deprived appellant of a fair trial on the sanity issue.
The second issue concerns the admission of cumulative photographic and videotape evidence. "The test of admissibility of photographs is relevance, and they are `admissible where they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted.'" King, 623 So.2d at 488, quoting Bush v. State, 461 So.2d 936, 939 (Fla. 1984), cert. denied, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986).
The photographic evidence in this case involves still photographs taken at the crime scene, autopsy photographs, and a videotape of the crime scene taken by Jacksonville law enforcement officers. Not surprisingly, the medical examiner's photographs are the most detailed and the most gruesome. Because the medical examiner used these photographs at trial to explain the nature and location of the injuries, the photographs were relevant, hence admissible. Similarly, the crime scene photographs, both videotape and still, were relevant because used by investigating officers to explain the crime scene. However, the videotape was needlessly repetitious, in that it depicts the same scenes as the still photographs. In addition, the videotape was prejudicial, in that it involved panning shots which included family photographs and a crucifix on the wall. Such details invite an emotional response. In light of the broad discretion accorded a trial judge with respect to admission of photographic evidence, and the relevance of the photographic evidence to the state's case, we would not reverse this cause based solely on the cumulative photographic evidence. Since our determination of issue one requires reversal for new trial, we are confident that the trial court will balance the probative value and prejudicial impact of the cumulative photographic evidence upon retrial of this cause.
The third issue concerns the denial of appellant's motion to suppress statements. A trial court's rulings on a motion to suppress, and on the voluntariness of a confession, are presumably correct. Henry v. State, 613 So.2d 429, 431 (Fla. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 699, 126 L.Ed.2d 665 (1994); Medina v. State, 466 So.2d 1046 (Fla. 1985); DeConingh v. State, 433 So.2d 501, 504 (Fla. 1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); Hills v. State, 629 So.2d 152, 156 (Fla. 1st DCA 1993); Davis v. State, 606 So.2d 460, 463 (Fla. 1st DCA 1992). Review of a ruling on the admissibility of a confession is based on the totality of the circumstances. Thompson v. State, 548 So.2d 198, 204 (Fla. 1989); Roman v. State, 475 So.2d 1228, 1232 (Fla. 1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986). It is the state's burden to show by a preponderance of the evidence that the confession was voluntary. Thompson, 548 So.2d at 204; Roman, 475 So.2d at 1232.
The first consideration in the voluntary analysis is the propriety of the arrest or detention which gave rise to the statements. An officer may detain a citizen temporarily if the officer reasonably suspects that the person has committed, is committing, or is about to commit, a crime. Mere suspicion is not enough to support a detention; rather, the officer must be able to articulate a well-founded suspicion of criminal activity. § 901.151, Fla. Stat. (1987); Popple v. State, 626 So.2d 185, 186 (Fla. 1993). In this context, a substantial body of case law has developed dealing with vehicle stops for traffic infractions, where it was asserted the investigatory stop was merely a pretext. Before *1136 evidence seized in connection with a vehicle stop can be admissible, the state must show that under the existing facts and circumstances, a reasonable officer would have made the vehicle stop even in the absence of the additional invalid purpose. Kehoe v. State, 521 So.2d 1094, 1097 (Fla. 1988); Hills, 629 So.2d at 154; State v. Lagree, 595 So.2d 1029, 1032 (Fla. 1st DCA), review denied, 601 So.2d 553 (Fla. 1992).
In denying appellant's motions to suppress, the trial court analogized appellant's unauthorized leave status to the pretextual traffic infraction cases. In this vein, the trial court found the NIS agents' subjective intent to question appellant as a witness or suspect in a homicide was irrelevant, and that his arrest was not a pretext. Appellant contends his arrest for unauthorized absence was a pretext, and the activities of the NIS agents in this case are proscribed by federal law.
Military participation in civilian law enforcement activities is restricted by the federal Posse Comitatus Act, 18 U.S.C. § 1385,[4] and by 10 U.S.C. § 375.[5] Cases addressing this issue have ruled that where military involvement is limited and there is an independent military purpose, "the coordination of military police efforts with those of civilian law enforcement officials does not violate either [section 1385 or section 375]." Hayes v. Hawes, 921 F.2d 100, 103 (7th Cir.1990). The test for violation of the federal law is: (1) whether civilian law enforcement officials made a "direct active use" of military investigators to "execute the laws;" (2) whether the use of the military "pervaded the activities" of the civilian officials; or (3) whether the military was used so as to subject "citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature." United States v. Hartley, 678 F.2d 961 (11th Cir.1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); United States v. McArthur, 419 F. Supp. 186, 194 (D.N.D.), aff'd sub nom., United States v. Caspar, 541 F.2d 1275 (8th Cir.1976), cert. denied, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). Where the involvement of the military police is pervasive, the exclusionary rule may be applied to suppress evidence seized in violation of the act. Hayes, 921 F.2d at 102; Taylor v. State, 645 P.2d 522 (Okla.Cr.App. 1982).
In this case, the activities of the NIS agents permeated the initial stages of the homicide investigation. Upon ascertaining that appellant purchased a one-way ticket to Virginia, the NIS agents obtained an authorization from his commanding officer enabling them to arrest appellant on grounds of desertion for unauthorized absence. The agents traveled to Virginia, where they interviewed appellant's family members and kept them under surveillance. When appellant was found and taken into custody, the NIS agents questioned him about the homicides, obtained oral and written statements from him, and seized his clothing and other personal effects. The NIS agents then transported appellant to Jacksonville, where they turned him over to the civilian authorities.
It was undisputed that under normal procedure, the Navy would have taken no action toward appellant's arrest and return until he had been absent thirty days. In fact, the NIS agent stated candidly that his primary purpose in traveling to Virginia was to question appellant about the homicides. We conclude the nature of the military involvement in the investigation may have constituted a violation of the federal Act, but the exclusionary rule should not be applied as a remedy for the violation. A majority of the courts *1137 addressing the issue have refused to apply the exclusionary rule to evidence seized in violation of the statute and regulations, in the absence of evidence of widespread and repeated violations. See Hayes, 921 F.2d at 104, and cases cited therein. See also United States v. Walden, 490 F.2d 372, 376-377 (4th Cir.), cert. denied, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974). Such widespread, repeated violations have not been alleged or shown to exist in this case.
Next, consideration must be given to whether the confession was obtained through coercive police conduct, either psychological or physical. State v. Sawyer, 561 So.2d 278, 285 (Fla. 2d DCA 1990). Relevant factors to consider are the suspect's age and legal sophistication, mental condition, psychological makeup, intelligence, education, and the physical setting of the interrogation. Id. To render a confession inadmissible on grounds of coercion, confusion, and intoxication, "the delusion or confusion must be visited upon the suspect by his interrogators; if it originates from the suspect's own apprehension, mental state, or lack of factual knowledge, it will not require suppression." Thomas v. State, 456 So.2d 454, 458 (Fla. 1984). Although statements or confessions made during a period of mental incompetency or insanity are inadmissible, Townsend v. Sain, 372 U.S. 293, 309, 83 S.Ct. 745, 755, 9 L.Ed.2d 770 (1963), "mere emotionalism, confusion, or depression do not dictate a finding of mental incompetency or insanity." United States v. Rouco, 765 F.2d 983, 993 (11th Cir.1985), cert. denied, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986). Where the evidence is conflicting, a trial court's finding that a confession was voluntary will not be disturbed on appeal. Keeton v. State, 427 So.2d 231, 232 (Fla. 3d DCA 1983); Collier v. State, 353 So.2d 1219, 1220 (Fla. 3d DCA 1977). See also Wilson v. State, 573 So.2d 77, 79 (Fla. 2d DCA 1990).
In the instant case, the NIS agent who conducted the interrogation of appellant, stated that he obtained only biographical information before giving appellant his Miranda warnings. According to the agent, appellant did not appear to be intoxicated, he was oriented to time and place, he indicated he understood his rights, he was not threatened or promised anything in return for his statement, and he did not ask for an attorney. The agent also stated that appellant trembled and held his head down throughout the interview. According to appellant, he was not given the Miranda warnings until after he admitted the homicides. It is undisputed that appellant spent the night preceding his arrest in the woods, he had not eaten for two days, and his hands shook throughout the interview. Appellant testified that when he asked the NIS agents when he would get an attorney, he was told that he would not have an attorney until his return to Florida.
When an accused makes a statement which could be characterized as an equivocal request for an attorney, an investigating official may continue the inquiry for the sole purpose of clarifying the equivocal request. Long v. State, 517 So.2d 664, 666-667 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988). An accused's willingness to respond to further custodial interrogation does not establish a valid waiver of the right to consult with counsel. Long, 517 So.2d at 667, citing Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).
Although the evidence in this case indicates that appellant was in a state of depression and possible confusion when his custodial statements were made, there is an absence of evidence that he was incompetent at the time. We are concerned about the active role taken by the NIS agents, including the custodial interrogation and seizure of physical evidence. Appellant's inquiry as to when he would be provided with an attorney was equivocal, and served to place the NIS agents on notice that the only proper further questioning would be efforts to clarify whether appellant was requesting counsel. Nevertheless, in view of the conflicting evidence on this point, the trial court's ruling that the statements were voluntary was not clearly erroneous, and will not be disturbed on appeal. See Thompson v. State, 548 So.2d 198, 204 n. 5 (Fla. 1989).
The first issue on cross-appeal concerns the trial court's refusal to instruct the jury on the underlying felonies of kidnapping *1138 and aggravated child abuse in the instructions on first-degree felony murder of the child. If the state seeks a conviction of first-degree murder on alternate theories of premeditation and felony murder, the trial court's failure to instruct on the underlying felony will invalidate the conviction unless the court can determine the error is harmless. Franklin v. State, 403 So.2d 975, 976 (Fla. 1981). Aggravated child abuse is listed as one of the offenses which will support a first-degree murder verdict if a death occurs during the commission, or attempt to commit, aggravated child abuse. § 782.04(1)(a)2, Fla. Stat. (1987); Pugh v. State, 624 So.2d 277 (Fla. 2d DCA 1993). In Mapps v. State, 520 So.2d 92 (Fla. 4th DCA), review denied, 528 So.2d 1182 (Fla. 1988), the court expressly rejected an argument that the felonies specified in the felony-murder statute merge with the homicide to prevent conviction of the first-degree murder charge. See also Freeze v. State, 553 So.2d 750, 753 (Fla. 2d DCA 1989) (state is empowered to charge a person with first-degree felony murder if a child dies as a result of the person's act of aggravated child abuse).
Evidence that confinement of a victim occurred to make another crime substantially easier of commission is sufficient to support a kidnapping charge. Ferguson v. State, 533 So.2d 763, 764 (Fla. 1988). A conviction for felony murder, based upon kidnapping as the underlying felony, is not invalidated simply because the murder of one victim is accomplished before the kidnapping of the second victim. Roberts v. State, 510 So.2d 885, 888 (Fla. 1987), cert. denied, 485 U.S. 943, 108 S.Ct. 1123, 99 L.Ed.2d 284 (1988).
In this case, the trial court denied the state's request for instructions on felony murder of the child based upon the underlying felonies of aggravated child abuse and kidnapping. However, the court gave an instruction on felony murder with burglary as the underlying felony. It cannot be determined whether the jury returned a conviction on the charge of premeditated murder, or felony murder based upon burglary as the underlying felony. Since there was evidence to sustain the conviction for first-degree murder of Amanda Smits under either theory, the state was entitled to the aggravated child abuse and kidnapping instructions with respect to the charge of felony murder of the child.
The second cross-appeal issue concerns the exclusion of evidence of the victim's state of mind. Under the provisions of section 90.803(3), Florida Statutes, hearsay statements of the victim may be admissible when offered to prove the victim's then existing state of mind regarding the elements of the offense underlying the state's felony murder theory. Bedford v. State, 589 So.2d 245, 252 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992). See also Peede v. State, 474 So.2d 808, 816 (Fla. 1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 575 (1986).
In this case, the state sought admission of an undated letter purportedly written by the victim to her husband, which indicated the victim had been unwell. The state also sought admission of statements by the victim's sister concerning the victim's pleasure at receiving an anniversary gift of flowers from her husband. The statements were offered to refute appellant's claim that the victim consented to sexual relations, as support for the state's felony murder theory predicated on sexual battery. The letter was undated, and no independent evidence was proffered to establish that the victim was unwell and so unlikely to engage in consensual sex during the relevant time period. Similarly, the victim's statement as to her pleasure at receiving flowers from her husband occurred some time before the crimes were committed. Due to the remoteness in time of the respective statements from the events at issue, the trial court did not abuse its discretion in excluding the statements as to the victim's state of mind.
Accordingly, the judgment and sentences are reversed, and the cause is remanded for a new trial. Upon retrial, the state is entitled to a jury instruction on aggravated child abuse and kidnapping in connection with the charge of felony murder of the child.
ERVIN and KAHN, JJ., concur.
NOTES
[1] The "copout" statement occurred in the following manner:

[The Prosecutor]: And the key defense comment here is that he was experiencing psychosis, that this was a psychotic episode, that she voluntarily had sex with him, whereupon he then went temporarily insane for a matter of the few minutes that it took him to kill these two people, and then he then returned to realty [sic] after he saw what he had done, and fled to Roanoke, Virginia.
They have even gotten some psychiatric testimony to support this theory. You will hear from these defense experts or witnesses. You will also hear from two psychiatrists who, upon the defense producing their witnesses, were appointed by the Court, the Judge here, to examine this defendant to see or try to determine objectively whether this person was actually insane at the time of the offense.
And then after the close of the evidence, you will be asked to decide whether this person was temporarily insane, or whether the insanity defense in this case is a copout.
[2] When Paula Smits' body was discovered, she was clad in shorts, T-shirt, and underwear.
[3] Since Paula Smits was fully dressed when she was killed, any probative value this demonstration might have had was more than outweighed by its prejudicial impact.
[4] 18 U.S.C. § 1385 provides:

Whoever, except in case and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.
[5] 10 U.S.C. § 375 provides:

The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.