619 So.2d 279 (1993)
Donn A. DUNCAN, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 78630.
Supreme Court of Florida.
April 29, 1993.
Rehearing Denied June 17, 1993.
*280 James B. Gibson, Public Defender, and Michael S. Becker, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant, cross-appellee.
Robert A. Butterworth, Atty. Gen. and Kellie A. Nielan, Asst. Atty. Gen., Daytona Beach, for appellee, cross-appellant.
PER CURIAM.
Donn A. Duncan, who stands convicted of first-degree murder, appeals his sentence of death. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
On the morning of December 29, 1990, Donn A. Duncan murdered his fiancee, Deborah Bauer. At the time of the murder, Duncan was living with Deborah Bauer, Deborah's daughter, Carrieanne Bauer, and her mother, Antoinette Blakeley. During the evening hours of December 28, 1990, Deborah left the house apparently to go drinking. Duncan left a short time later. When Duncan returned home around 8:30 p.m., he told Antoinette that Deborah would not be home until later because she had gone off with a guy who was going to buy her beer because Duncan had refused to do so. Duncan also told Antoinette to ask Deborah to sleep on the couch because he did not want to argue with her and that he would be leaving in the morning. Duncan then went into the bedroom, where he remained until the next morning.
When Deborah returned around 10:30 p.m., her mother told her not to go into the bedroom because Duncan did not want to be bothered. A short time later Deborah went into the bedroom to get some cigarettes but left the room after a couple of minutes. Neither Antoinette nor Carrieanne heard any arguing or fighting while Deborah was in the room. Deborah slept in the living room with her mother and daughter, neither of whom was aware of any further contact between Duncan and Deborah during the night.
The next morning, Deborah went outside to smoke a cigarette. While Deborah was on the front porch, Duncan got up. Antoinette told him "there is the door," indicating that he should leave. After he and Antoinette exchanged words, Duncan put on a jacket and walked out on the porch where Deborah was sitting, smoking a cigarette. Duncan stood behind Deborah for a few seconds and then stabbed her multiple times with a kitchen knife he had hidden in his jacket. When Carrieanne responded *281 to her mother's screams, Duncan approached Carrieanne with the knife and asked, "You want it too?" Believing Duncan would stab her too, Carrieanne ran and hid in the closet.
When Antoinette asked a neighbor who had witnessed the attack to call 911 because her daughter had been stabbed, Duncan said, "Yeah, I did it on purpose. I'll sit here and wait for the cops." Duncan, who had thrown the knife on the ground, then waited until police arrived. Upon their arrival, Duncan told police, "I stabbed her." After being advised of his rights, Duncan told police that he and the victim had been arguing and that he remembered going outside and stabbing her twice. In a signed statement, Duncan wrote:
I walked out the door with the knife and stabbed Debbie as she was sitting on the stoop. I think I stabbed her twice. I saw her go off with two guys last night she came home about 1:00 a.m. and I guess I went nuts.
Deborah Bauer died two hours after the attack. The cause of death was a stab wound to the right chest. According to the medical examiner, the victim also had suffered two life threatening wounds to the back and three defensive wounds, one to each arm and one to her leg.
Duncan was charged with and convicted of the first-degree murder of Deborah Bauer and aggravated assault on Carrieanne Bauer. He was sentenced to three and one-half years' imprisonment on the aggravated assault. In accordance with the jury's twelve-to-zero recommendation of death, the trial judge sentenced Duncan to death for the first-degree murder.
In aggravation, the trial court found that Duncan had previously been convicted of a felony involving the use or threat of violence  the aggravated assault on Carrieanne and the second-degree murder of a fellow inmate in 1969. In mitigation, the trial court considered the following fifteen mitigating factors urged by the defendant: 1) Duncan's childhood and upbringing saddled him with an emotional handicap; 2) Duncan's ability to conform his conduct to the requirements of the law was substantially impaired at the time of the crime; 3) Duncan was under the influence of extreme mental or emotional disturbance at the time of the killing; 4) the defendant was under the influence of alcohol at the time of the killing; 5) the killing was not for financial gain; 6) the killing did not create a great risk of death to many persons; 7) the killing did not occur while Duncan was committing another crime; 8) the victim was not a stranger; 9) the victim was not a child; 10) Duncan was a good, dependable, and capable employee; 11) Duncan was a good listener and supportive friend; 12) Duncan had satisfactorily completed his parole and was discharged from parole; 13) Duncan confessed to the killing; 14) the killing came as a result of and subsequent to a domestic dispute; 15) Deborah Bauer chose Donn Duncan to be her husband.
All issues on appeal concern the sentencing phase of the trial.[1] Duncan raises the following claims: 1) his death sentence is disproportionate and is cruel or unusual punishment; 2) it was reversible error to admit a gruesome photograph of the victim of the 1969 murder; and 3) the trial court erred in refusing to give numerous special jury instructions. The State cross-appeals the trial court's findings that 1) Duncan was under the influence of alcohol at the time of the murder; 2) Duncan was under the influence of extreme mental or emotional disturbance at the time of the murder, section 921.141(6)(b), Florida Statutes (1989); and 3) Duncan's ability to conform his conduct to the requirements of the law was substantially impaired, section 921.141(6)(f), Florida Statutes (1989).
First, we address Duncan's second claim challenging the admission of an extremely gruesome photograph that depicts gaping wounds to the prior victim's head and face. Prior to the commencement of the penalty phase, the defense filed a motion in limine to prevent the State from presenting evidence of the facts and circumstances of *282 Duncan's 1969 conviction of second-degree murder. The motion was denied; however, the court withheld ruling on the admission of the photograph of the prior victim until after the State presented other evidence of the circumstances of the crime.
After a certified copy of the judgment and sentence for second-degree murder was entered into evidence, the State presented the testimony of Captain Martin Stephens, the chief investigator of the 1969 murder. Captain Stephens, who saw the victim in the emergency room soon after the attack, testified concerning the injuries sustained by the prior victim. He explained that the victim was severely cut about the face and head.
Captain Stephens then testified in detail concerning the circumstances of the prior murder.[2] Much of this testimony was offered to show the similarity between the 1969 murder and the murder of Deborah Bauer in an attempt to rebut Duncan's assertion of mental mitigation. The State then introduced, over objection, the photograph of the injuries sustained by the prior victim. The trial court allowed the photograph to be introduced to show the force required to cause the injuries described by the investigator and to show the position of the victim when the attack occurred.
In Rhodes v. State, 547 So.2d 1201, 1204-05 (Fla. 1989), we noted that evidence concerning the circumstances of a prior felony conviction involving the use or threat of violence is admissible during the penalty phase of a capital trial. However, we cautioned that there are limits on the admissibility of such evidence. We emphasized that "the line must be drawn when [evidence of the circumstances of the prior offense] is not relevant, gives rise to a violation of a defendant's confrontation rights, or the prejudicial value outweighs the probative value." Id. at 1205.
We agree with Duncan that the prejudicial effect of this gruesome photograph clearly outweighed its probative value. Section 90.403, Fla. Stat. (1991). The photograph did not directly relate to the murder of Deborah Bauer but rather depicted the extensive injuries suffered by the victim of a totally unrelated crime. Moreover, the photograph was in no way necessary to support the aggravating factor of conviction of a prior violent felony. A certified copy of the judgment and sentence for second-degree murder indicating that Duncan pled guilty to and was convicted of a violent felony had been introduced. As explained above, there was also extensive testimony from Captain Stephens explaining the circumstances of the prior murder and the nature of the injuries inflicted.
Although we agree that it was error to admit the challenged photograph, we find the error harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Once admitted, no further reference was made to the photograph. It was not urged as a basis for a death recommendation; nor was it otherwise made a focal point of the proceedings. Moreover, the jury was well aware of the fact that Duncan had previously been convicted of the brutal attack and murder of another.
We find no merit to Duncan's third claim concerning the trial court's refusal to give numerous requested special instructions. Prior to addressing Duncan's proportionality claim, we find it necessary to address the State's claims on cross-appeal.
In its cross-appeal, the State contends that the mitigating factor of acting under the influence of alcohol and the two *283 statutory mental mitigating circumstances were not established in this case. Although a mitigating circumstance need not be proved beyond a reasonable doubt, it must be "reasonably established by the greater weight of the evidence." Nibert v. State, 574 So.2d 1059, 1061 (Fla. 1990) (quoting Campbell v. State, 571 So. 415, 419 (Fla. 1990)). A trial court's findings concerning mitigation will not be disturbed if the findings are supported by "sufficient competent evidence in the record." Campbell, 571 So. at 420; see also Nibert, 574 So.2d at 1062. However, after a thorough review of the record, we agree with the State that the record is devoid of any evidence supporting the challenged circumstances.
As noted by the trial court in its sentencing order, "[a]ll witnesses testified that the Defendant appeared sober and that no one observed him drink any alcoholic beverages since the night before." In light of this finding of fact, which is supported by the record, it is unclear whether the trial court actually found that Duncan was under the influence of alcohol at the time of the murder or whether the trial court was merely reciting the mitigating circumstance as proposed by the defendant. See Campbell, 571 So.2d at 419 (sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by defendant).
The sentencing court stated in its written order that the challenged mitigating circumstances "are based on testimony from the guilt phase of the trial." However, according to the testimony of the victim's daughter and mother, Duncan left the house twice the evening preceding the murder, ultimately returning around 8:30 p.m. After telling Antoinette to ask Deborah to sleep on the couch, Duncan went to the bedroom where he remained until the next morning. Carrieanne stated that when Duncan returned home the evening before the murder he appeared to have been drinking. However, neither Antoinette nor Carrieanne saw Duncan drink any alcoholic beverages the night before or the morning of the murder. Antoinette testified that Duncan did not appear to have been drinking the morning of the murder. The crime scene technician found no evidence of alcoholic beverages in Duncan's room. Antoinette testified that there were no alcoholic beverages elsewhere in the house. The deputies who reported to the scene on the morning of the stabbing testified that there was no evidence that Duncan was intoxicated.
The only evidence of Duncan's intoxication was Carrieanne's testimony that Duncan appeared to have been drinking when he returned home at approximately 8:30 p.m. the night before the murder. That testimony, standing alone, is insufficient to support a finding that Duncan was intoxicated at the time of the stabbing, some eleven hours later at 7:30 a.m. We cannot agree with Duncan's contention that the fact that the victim had a blood alcohol level of .143 at the time of her admission to the hospital around 8:00 a.m. somehow serves as evidence that he was intoxicated at the time of the stabbing.
We also agree with the State that there was no evidence to support the statutory mental mitigating factors urged by the defendant. In State v. Dixon, 283 So.2d 1, 10 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), we explained that extreme mental or emotional disturbance as used in section 921.141(6)(b), is interpreted as "less than insanity but more than the emotions of an average man, however inflamed." We went on to explain that substantial impairment of the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, as used in section 921.141(6)(f), refers to mental disturbance that "interferes with but does not obviate the defendant's knowledge of right and wrong." Id.
There was no evidence of extreme mental or emotional disturbance or of mental disturbance that interfered with Duncan's knowledge of right and wrong. The only evidence of Duncan's mental state at the time of the murder is testimony concerning Duncan's actions prior to and after the murder and statements made by Duncan to *284 police. Other than Duncan's statements to police, there was no evidence that Duncan "went nuts" prior to the stabbing. In the absence of any evidence of mental or emotional disturbance, Duncan's statements to police that he "went nuts" after arguing with the victim are insufficient to establish the existence of the mental mitigation urged. See Robinson v. State, 574 So.2d 108, 111 (Fla. 1991) (in the absence of any evidence of intoxication at the time of crime, defendant's hearsay statement to doctor that he was intoxicated during offense was insufficient to establish mitigating circumstance of intoxication), cert. denied, ___ U.S. ___, 112 S.Ct. 131, 116 L.Ed.2d 99 (1991).
Finally, we reject Duncan's claim that death is not proportionately warranted in this case. As noted above, the mitigating factor of under the influence of alcohol and the two statutory mental mitigators were not established in this case. Therefore, the cases cited in which the defendant was intoxicated, suffering from drug or alcohol addiction, or suffering from extreme mental or emotional disturbance at the time of the murder are distinguishable. See e.g., Penn v. State, 574 So.2d 1079 (Fla. 1991); Songer v. State, 544 So.2d 1010 (Fla. 1989); Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988); Ross v. State, 474 So.2d 1170 (Fla. 1985). Moreover, the cases cited by Duncan do not involve a defendant who previously had been convicted of murder. Comparing the circumstances of this case with those of other capital cases, we conclude that death is appropriate. See e.g., Lemon v. State, 456 So.2d 885 (Fla. 1984) (death proportionately warranted for defendant who killed a women with whom he had a relationship after a previous conviction for a similar violent offense), cert. denied, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985).
Accordingly, having found no reversible error, we affirm the convictions and sentences.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion in which SHAW, J., concurs.
KOGAN, Justice, concurring in part and dissenting in part.
I concur in all portions of the majority opinion except that portion finding the erroneous admission of the photograph of the prior murder victim harmless and that portion addressing Duncan's proportionality claim.
The challenged photograph depicted the gaping wounds to Willie Davis' head and face. Most notably, it showed the victim's nose, from just below his eyes to his upper lip, hanging away from his face. As noted by the majority, prior to the admission of the photograph, Captain Stephens had described these injuries in graphic detail. Thus, there is no question that the probative value of the challenged photograph was at best slight in comparison with its potential for inflaming the jury and thereby impermissibly affecting the jury's sentencing recommendation.
We recently cautioned trial judges to carefully scrutinize photographic evidence for prejudicial effect, particularly when less graphic evidence is available to illustrate the same point. Marshall v. State, 604 So.2d 799, 804 (Fla. 1992). We have also cautioned against admission of extremely gruesome photographs which have little or no relevance. Czubak v. State, 570 So.2d 925, 929 (Fla. 1990). Such caution is particularly warranted in cases such as this where the challenged photograph is of the victim of an unrelated prior offense. When a gruesome photograph is erroneously admitted under such circumstances, its admission likely will be harmful. See Henry v. State, 574 So.2d 73, 75 (Fla. 1991) (photograph of victim of collateral crime was so inflammatory that it could have unfairly prejudiced the jury).
After viewing the challenged photograph in this case, I cannot agree that simply because no further reference was made to *285 the photograph it did not become a focal point in the sentencing proceedings. The photograph is so inflammatory that I cannot say beyond an reasonable doubt that it did not contribute to the jury's recommendation. State v. DiGuilio, 491 So.2d 1129, 1138 (Fla. 1986). Because I believe the admission of the challenged photograph was harmful, I would vacate the sentence of death and remand for a new sentencing hearing before a newly empaneled jury and would decline to address Duncan's proportionality claim at this time.
SHAW, J., concurs.
NOTES
[1] Duncan does not appeal his convictions; however, our review of the record reveals substantial competent evidence to support the convictions.
[2] Captain Stephens explained that during an interview Duncan told him that the victim, a fellow inmate named Willie Davis, had been threatening him. After Davis called Duncan "a white cracker" and told him he was going to "get him," Duncan decided to kill Davis. The next morning, Duncan stole a bush axe from the maintenance shop. Duncan sawed off the handle of the axe and hid it in his jacket. He then went into the restroom where Davis was sitting on the commode and struck him three times in the head with the axe. As Duncan left the restroom, he told a fellow inmate who heard the attack, "Let that be a lesson to everybody, you can only push a man so far and that's what happens to you." Duncan then laid the bush axe down and walked to the control room and told the classifications officer that he had just killed a man.