894 So.2d 817 (2004)
STATE of Florida, Appellant/Cross-Appellee,
v.
Donn A. DUNCAN, Appellee/Cross-Appellant.
Donn Duncan, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC02-636, SC03-145.
Supreme Court of Florida.
November 24, 2004.
Rehearing Denied February 11, 2005.
*819 Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Douglas T. Squire, Assistant Attorney General, Daytona Beach, FL, for Appellant/Cross Appellee/Petitioner.
Bill Jennings, Capital Collateral Regional Counsel, Marie-Louise Samuels Parmer, Assistant CCRC, Middle Region, Tampa, FL, for Appellee/Cross Appellant/Respondent.
PER CURIAM.
The State of Florida appeals an order of the circuit court granting in part and denying in part a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Duncan cross-appeals and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

FACTS AND PROCEDURAL HISTORY
Donn Duncan was adjudicated guilty of the 1990 murder of Deborah Bauer. See Duncan v. State, 619 So.2d 279, 280 (Fla.1993).[1] The jury, by a vote of twelve to zero, recommended the death penalty, and, following that recommendation, the trial court imposed a sentence of death. See id. at 281. On direct appeal, this Court upheld Duncan's conviction and sentence. See id. at 284. The facts surrounding the murder of Deborah Bauer were ably detailed in our opinion on direct appeal:
On the morning of December 29, 1990, Donn A. Duncan murdered his fiancee, Deborah Bauer. At the time of the murder, Duncan was living with Deborah Bauer, Deborah's daughter, Carrieanne Bauer, and her mother, Antoinette Blakeley. During the evening hours of December 28, 1990, Deborah left the house apparently to go drinking. Duncan left a short time later. When Duncan returned home around 8:30 p.m., he told Antoinette that Deborah would not be home until later because she had gone off with a guy who was *820 going to buy her beer because Duncan had refused to do so. Duncan also told Antoinette to ask Deborah to sleep on the couch because he did not want to argue with her and that he would be leaving in the morning. Duncan then went into the bedroom, where he remained until the next morning.
When Deborah returned around 10:30 p.m., her mother told her not to go into the bedroom because Duncan did not want to be bothered. A short time later Deborah went into the bedroom to get some cigarettes but left the room after a couple of minutes. Neither Antoinette nor Carrieanne heard any arguing or fighting while Deborah was in the room. Deborah slept in the living room with her mother and daughter, neither of whom was aware of any further contact between Duncan and Deborah during the night.
The next morning, Deborah went outside to smoke a cigarette. While Deborah was on the front porch, Duncan got up. Antoinette told him "there is the door," indicating that he should leave. After he and Antoinette exchanged words, Duncan put on a jacket and walked out on the porch where Deborah was sitting, smoking a cigarette. Duncan stood behind Deborah for a few seconds and then stabbed her multiple times with a kitchen knife he had hidden in his jacket. When Carrieanne responded to her mother's screams, Duncan approached Carrieanne with the knife and asked, "You want it too?" Believing Duncan would stab her too, Carrieanne ran and hid in the closet.
When Antoinette asked a neighbor who had witnessed the attack to call 911 because her daughter had been stabbed, Duncan said, "Yeah, I did it on purpose. I'll sit here and wait for the cops." Duncan, who had thrown the knife on the ground, then waited until police arrived. Upon their arrival, Duncan told police, "I stabbed her." After being advised of his rights, Duncan told police that he and the victim had been arguing and that he remembered going outside and stabbing her twice. In a signed statement, Duncan wrote:
I walked out the door with the knife and stabbed Debbie as she was sitting on the stoop. I think I stabbed her twice. I saw her go off with two guys last night she came home about 1:00 a.m. and I guess I went nuts.
Deborah Bauer died two hours after the attack. The cause of death was a stab wound to the right chest. According to the medical examiner, the victim also had suffered two life threatening wounds to the back and three defensive wounds, one to each arm and one to her leg.
Id. at 280-81.
The trial court found one aggravating circumstance  Duncan had previously been convicted of a felony involving the use or threat of violence, namely the aggravated assault on Carrieanne Bauer and the second-degree murder of a fellow inmate in 1969. See id. at 281. In mitigation, the trial court considered the following fifteen mitigating factors urged by the defendant: (1) Duncan's childhood and upbringing saddled him with an emotional handicap; (2) Duncan's ability to conform his conduct to the requirements of the law was substantially impaired at the time of the crime; (3) Duncan was under the influence of extreme mental or emotional disturbance at the time of the killing; (4) Duncan was under the influence of alcohol at the time of the killing; (5) the killing was not for financial gain; (6) the killing did not create a great risk of death to many persons; (7) the killing did not occur while Duncan was committing another *821 crime; (8) the victim was not a stranger; (9) the victim was not a child; (10) Duncan was a good, dependable, and capable employee; (11) Duncan was a good listener and supportive friend; (12) Duncan had satisfactorily completed his parole and was discharged from parole; (13) Duncan confessed to the killing; (14) the killing came as a result of and subsequent to a domestic dispute; and (15) Deborah Bauer chose Donn Duncan to be her husband. See id.
On direct appeal, Duncan raised three issues related to the penalty phase of his trial. See id.[2] The issues raised by Duncan were: (1) the death sentence is disproportionate and constitutes cruel or unusual punishment; (2) it was reversible error to admit a gruesome photograph of the victim of the 1969 murder; and (3) the trial court erred in refusing to give numerous special jury instructions. See id. Additionally, the State cross-appealed the trial court's findings that (1) Duncan was under the influence of alcohol at the time of the murder; (2) Duncan was under the influence of extreme mental or emotional disturbance at the time of the murder; and (3) Duncan's ability to conform his conduct to the requirements of the law was substantially impaired. See id.
This Court summarily rejected Duncan's third claim, but with respect to his second claim, we agreed with Duncan that it was error for the trial court to allow the State to admit the challenged photograph because the prejudicial effect of the photo outweighed its probative value. See id. at 282. However, we determined that the error was harmless beyond a reasonable doubt considering that no further reference was made to the photo after it was introduced, it was not urged as a basis for a death recommendation, it was not made a focal point of the proceedings, and the jury was well aware of the fact that Duncan had previously been convicted of another murder. See id.
With respect to the three arguments raised on cross-appeal by the State, we agreed with the State that the mitigating factors of acting under the influence of alcohol and the two statutory mental health mitigators were not supported. See id. at 283 ("[A]fter a thorough review of the record, we agree with the State that the record is devoid of any evidence supporting the challenged circumstances."). We noted that the only evidence of Duncan's intoxication was the daughter's testimony that Duncan appeared to have been drinking when he returned home approximately eleven hours before the murder. See id. Further, no evidence was presented demonstrating an extreme mental or emotional disturbance or a mental disturbance that interfered with Duncan's knowledge of right and wrong. See id. The final issue addressed by this Court on direct appeal was Duncan's claim that the death penalty was disproportionate in his case. See id. at 284. We concluded that, compared to other capital cases, death was appropriate. See id.
Duncan subsequently filed a timely rule 3.850 motion, followed by five amendments, with the final amended motion raising twelve claims of error, including numerous subclaims. In July 1998, the trial court held a Huff[3] hearing to determine whether an evidentiary hearing on any of Duncan's claims was warranted. The court determined that an evidentiary hearing *822 was required to address several of the issues raised by Duncan, namely Duncan's claims of: (1) ineffective assistance of counsel during the guilt phase related to mental health issues and concession of guilt; (2) ineffective assistance of counsel at the penalty phase; and (3) counsel's alleged ineffectiveness as it related to mental health experts. The evidentiary hearing was held on December 14, 1999, and June 12-13, 2000.
The trial court ruled that all but one of Duncan's claims were either insufficiently pled, procedurally barred, or without merit; only Duncan's claim that counsel was ineffective for failing to introduce available mental health mitigation that could have led the jury to recommend a life sentence was meritorious. Specifically, the trial court concluded that based upon the testimony provided by Dr. Berland, Duncan's mental health expert, during the evidentiary hearing, "counsel knew or should have known of the existence of various mitigating factors that could have been presented during the penalty phase. The onus is therefore on the State to demonstrate that counsel had a valid strategic or tactical basis for declining to present those factors." Order Granting in Part and Denying in Part Fifth Amended Motion to Vacate Judgments of Conviction and Sentences at 16. Noting that Duncan's penalty phase trial counsel was not able to provide a specific reason as to why Dr. Berland was not called to testify, the trial court ruled that both the performance prong and prejudice prong of the Strickland[4] test for ineffective assistance of counsel were satisfied. Therefore, the trial court held that Duncan was entitled to a new penalty phase proceeding. The State now appeals the trial court's grant of a new penalty phase. Further, Duncan cross-appeals, raising numerous claims.[5] Additionally, Duncan filed a petition for a writ of habeas corpus, asserting several claims.[6]

*823 STATE'S 3.850 APPEAL
Following the United States Supreme Court's decision in Strickland, this Court held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). Ineffective assistance of counsel claims present a mixed question of law and fact and, therefore, are subject to plenary review based upon the Strickland test. See id.; see also Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999). Under this standard, this Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.
There is a strong presumption that trial counsel's performance was effective. Strickland provides: "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," 466 U.S. at 689, 104 S.Ct. 2052, and further: "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690, 104 S.Ct. 2052. The defendant alone carries the burden to overcome the presumption of effective assistance: "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. 2052. The United States Supreme Court explained:
[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.
Id. at 690, 104 S.Ct. 2052; see also Asay v. State, 769 So.2d 974, 984 (Fla.2000) ("[T]he defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy."). Finally, "[j]udicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. 2052.
Initially, the State argues that the trial court shifted the burden from the defendant to the State to prove that counsel's performance was reasonable. After evaluating the postconviction evidentiary hearing testimony provided by Dr. Berland, the *824 mental health expert presented by Duncan, the circuit court, in its order, wrote:
Based on Dr. Berland's testimony, the Court finds that counsel knew or should have known of the existence of various mitigating factors that could have been presented during the penalty phase. The onus is therefore on the State to demonstrate that counsel had a valid strategic or tactical basis for declining to present those factors.

Order Granting in Part and Denying in Part Fifth Amended Motion to Vacate Judgments of Conviction and Sentences at 16 (emphasis added). The lower court further wrote:
Simply asserting that something was done for unknown strategic reasons is not sufficient. An evidentiary hearing is held so that the Court may hear what the actual reason was, and may then determine whether that reason is consistent with professional standards. In the absence of a specific reason, the Court is constrained to find that the [sic] Mr. Duncan's allegation has satisfied the performance prong of Strickland.

Id. at 18. While the United States Supreme Court has unquestionably determined that the burden of persuasion is on the defendant to demonstrate ineffective assistance, see Strickland, 466 U.S. at 689, 104 S.Ct. 2052, we have held that "[t]he failure to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rose v. State, 675 So.2d 567, 571 (Fla.1996).
If the trial court's order was understood as holding that Duncan is entitled to relief solely because his former attorney was unable to provide the court with a reason for his failure to call Dr. Berland to testify, then such a holding would be in error, as it would constitute improper burden shifting. Ineffective assistance of counsel is not proven, per se, merely because the attorney whose acts are being questioned cannot provide a justification for his actions. The United States Supreme Court has held, and we have recognized, that the burden is on the moving party to demonstrate that the two components of Strickland, namely that the acts or omissions of the lawyer were outside the broad range of reasonably competent performance and that the substantial deficiency so affected the proceeding that confidence in the outcome is undermined, have been satisfied. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052; Asay, 769 So.2d at 984. Once the moving party has made the required showing, an objective basis for counsel's actions must be found, within the record, to justify counsel's performance and thereby rebut the moving party's claim. If the record itself does not provide such justification, then the court has no choice but to require the State, and the attorney whose performance is in question, to answer the moving party's allegations.
In the instant action, the trial court did not improperly shift the burden to the State to prove counsel was effective. A review of the court's order demonstrates that the trial court followed the proper procedure in determining that a new penalty phase is warranted. Initially, the court considered the evidence presented by Duncan, and determined that Duncan had satisfied the demands of Strickland. Next, the court reviewed the record and held that the record, which included the testimony of Duncan's former attorney, did not provide the requisite justification for the attorney's performance, and therefore Duncan was entitled to a new penalty phase. Having reviewed the record and considered both parties' arguments on appeal, we hold that Duncan did satisfy the requirements of Strickland, and the record does not provide an objective basis to justify *825 counsel's actions, and therefore the trial court properly granted Duncan a new penalty phase.
To satisfy the first requirement of Strickland, the deficiency prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Ragsdale v. State, 798 So.2d 713, 715 (Fla.2001) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). The postconviction trial court ruled that Duncan had sufficiently demonstrated counsel's ineffectiveness. With respect to the issue of counsel's failure to present evidence regarding mental health mitigation, Duncan presented several witnesses during the postconviction evidentiary hearing. Most importantly, the court heard the testimony of Dr. Berland, the mental health expert originally hired by defense counsel at the time of the trial, but never called to testify on Duncan's behalf. According to Dr. Berland's testimony at the evidentiary hearing, he first became involved in Duncan's case in 1991. He interviewed Duncan twice, he conducted psychological testing on Duncan, and he interviewed three lay witnesses. Dr. Berland testified that it was his opinion, based on his evaluation, that Duncan suffered from a mental illness, specifically a chronic, long-lasting psychotic disturbance, and that there was evidence of delusional paranoid thinking. Further, Dr. Berland stated that he also had psychological testing that suggested brain injury, although he had no definitive history of brain injury. The lay witnesses contacted by Dr. Berland corroborated symptoms of a psychotic disturbance and significant drug abuse. Dr. Berland explained that while he would have testified regarding Duncan's mental illness, it would have been better if he had been able to continue his evaluation by contacting more lay witnesses. However, he was convinced he had something substantial.
In our opinion on direct appeal, we held that "[t]here was no evidence of extreme mental or emotional disturbance or of mental disturbance that interfered with Duncan's knowledge of right and wrong." Duncan, 619 So.2d at 283. This lack of evidence caused us to hold that the trial court's consideration of the two mental health mitigating factors in determining the propriety of a death sentence was improper. See id. We note that proper consideration of the mitigating factors in this case is all the more important given the trial court's finding of only one aggravating factor. Clearly, as the trial court originally determined that the two mental health mitigating factors were supported, Duncan's penalty phase counsel must have attempted to argue in support of mental health mitigation. However, we held on direct appeal that he failed to present any evidence to support the two mitigating factors. As was made evident during the postconviction evidentiary hearing, Dr. Berland had evidence to support the mental health mitigators that was not presented. Unquestionably, had the available, substantial evidence been presented to support the two statutory mental health mitigating factors, the case is placed in an entirely different posture and our confidence in the penalty phase is undermined.
The trial judge presiding over the postconviction motion and evidentiary hearing determined that Dr. Berland was a credible witness who had available evidence that could have been presented. We agree. The doctor's testimony satisfies Duncan's burden of identifying particular omissions made by his penalty phase counsel that were outside the broad range of reasonably competent performance. It was then the State's obligation to demonstrate, either through the trial record or *826 the testimony of Duncan's trial counsel, a reasonable, objective justification for counsel's failure to present the available evidence of mental health mitigation.
Despite the trial court's statement, in its order, that "the Court can conceive of sound strategic and tactical reasons for deciding not to call Dr. Berland to testify," Order Granting in Part and Denying in Part Fifth Amended Motion to Vacate Judgments of Conviction and Sentences at 18, it is clear to us that the record is completely devoid of any justification for counsel's failure to present the available evidence. The trial court did not provide what it believed to be the "sound strategic and tactical reasons for deciding not to call Dr. Berland," nor can we ascertain from this record what those reasons may have been. When questioned during oral argument, the State's attorney could also not provide this Court with any such reasons. We again emphasize that our holding is not based solely upon Duncan's former attorney's failure to provide a justification for his actions. Instead, it is the complete absence in the record before us of any reason to support why the doctor was not called to testify on Duncan's behalf. Duncan, having satisfied his burden under Strickland, is entitled to a new penalty phase.

DUNCAN'S 3.850 CROSS-APPEAL
Having determined that Duncan is entitled to a new penalty phase as a result of the ineffectiveness of his penalty phase counsel in failing to present available evidence in support of mental health mitigation, it is unnecessary for us to address the claims raised by Duncan in his cross-appeal regarding additional errors that he asserts occurred during the penalty phase. Therefore, we decline to address claims five, six, seven, and eight of Duncan's cross-appeal. With respect to claims one through four, which all pertain to alleged errors committed during the guilt phase, and claim nine regarding Duncan's inability to interview jurors, we hold that these claims are all without merit.[7] Finally, regarding Duncan's tenth claim  that a combination of procedural and substantive errors deprived Duncan of a fundamentally fair capital trial and penalty phase guaranteed by the United States and Florida Constitutions  a review of the postconviction record reveals this claim was raised for the first time in Duncan's first amended motion for postconviction relief. However, this issue was not raised in Duncan's fifth amended motion for postconviction relief, the motion specifically ruled upon by the circuit court, and therefore the trial court did not address this issue in its order. "[I]t is this Court's job to review a circuit court's ruling on a rule 3.850 claim, not to decide the merits of that claim." Thomas v. State, 838 So.2d 535, 539 (Fla.2003). As this issue was neither raised nor decided below, it is procedurally barred.[8]

PETITION FOR WRIT OF HABEAS CORPUS

Claim 1: Failure to Raise a Nixon Error
Duncan's first claim in his habeas petition is wholly identical to the second *827 claim raised in his cross-appeal, namely that trial counsel was ineffective during the guilt phase for conceding that Duncan was guilty of second-degree murder, save for the fact that Duncan is now arguing that his appellate counsel was ineffective for failing to raise the issue on direct appeal. This Court has held that the criteria for proving ineffective assistance of appellate counsel parallel the standard used for ineffectiveness of trial counsel claims. See State v. Riechmann, 777 So.2d 342, 364 (Fla.2000). Therefore, here, Duncan must demonstrate:
(1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance and (2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result.
Id. (quoting Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985)). As we denied Duncan's identical claim in his cross-appeal, we likewise conclude that the instant claim is without merit. Duncan's trial counsel made a strategic, tactical decision to address second-degree homicide in an attempt to save Duncan's life. Given the weight of the evidence against Duncan, including a confession and three eyewitnesses, trial counsel's strategy was not unreasonable. See Jones, 845 So.2d at 70-71. Therefore, appellate counsel was not ineffective for failing to raise this issue on direct appeal.

Claim 2: Failure to Challenge the Introduction of Improper Evidence
In his second claim, Duncan challenges the following penalty phase testimony of one of the State's witnesses, Detective Nazarchuck:
Q (Prosecutor): In the course of your investigation, did you as a representative of law enforcement become aware that Carrieanne Bauer indicated Donn Duncan made certain statements right after or, you know, within minutes after Deborah Bauer's stabbing?
A (Detective Nazarchuck): Yes.
Q: And those statements would be, would have included, "I hope you die"?
Before the witness could respond, defense counsel objected to the testimony. The following colloquy then occurred in a bench conference:
Defense counsel: Although the rules of evidence are relaxed in this type of proceeding, I think we're going, the state is going beyond the bounds of proprietary; that witness testified in this matter, there was testimony of the statement that they were afraid. This is just once again repetitive, a rehash of testimony that's already been entered in this case.
Prosecutor: I have  well, I don't know your, what your legal objection is. What's the legal objection?
Defense counsel: I put it on the record, ma'am.
Prosecutor: Impropriety? I am questioning this witness, and what I'm establishing is what Carrieanne Bauer told law enforcement concerning the defendant's statements, there's actually a remarkable similarity to what he said in 1969, and after killing Willie Davis. That goes directly to  the defense is asking about whether or not he's, whether or not he has the ability to comprehend the criminality of his conduct. Both of these cases he clearly, he understood the criminality of the conduct. I'm establishing by identifying the statement, that is Carrieanne in no way could have had any idea what he said back in 1969; that he truly said those. The *828 similarity, I want to establish they knew about the statements and they were recorded before law enforcement ever found the details of his case in Marion County.
Defense counsel: That doesn't 
Prosecutor: It makes it clear there was no hankey-panky about the similarity of the statements.
Defense counsel: That not [sic] does not address the issue of it being repetitive testimony which has already been presented.
Prosecutor: I am allowed to go into these things on the sentencing.
The court: Okay.
Prosecutor: I have to have him identify what statements his testimony is going to be about.
The court: Okay.
Defense counsel: The other thing, she was leading the witness.
Prosecutor: I can ask him to repeat the statements. I was just trying to move it along.
The court: Sustain the object as to leading. As far as the other objection, repetitious is an objection in the discretion of the Court. I think the time lag between the testimony that was given at the trial and the purpose the prosecutor wants to introduce the statements, at this time I think it's appropriate. It would not be appropriate to sustain an objection based on that. So I'll overrule that objection.
The direct examination of the detective then continued:
Q (Prosecutor): Detective Nazarchuck, could you tell us the statements that Carrieanne Bauer was to advise you during the course of the investigation that Donn Duncan had made after the stabbing of her mother?
A (Detective Nazarchuck): Something to the effect, do you want some of this, of this, bitch. Then said I hope you die, bitch. I did this on purpose. I'll sit here and wait for the police.
Q: Now, at the time that you became aware of Carrieanne Bauer's testimony as to what Donn Duncan said and as to his exact words, did you, as far as, you know, or any local representative of law enforcement have any information as to the details of the old Marion County case?
A: I was not aware of any details until much later.
The State had no further questions, and defense counsel did not cross-examine the witness.
Essentially, Duncan is asserting two issues relating to the testimony of Detective Nazarchuck. First, Duncan maintains that the detective's testimony was impermissible double hearsay, as the State did not demonstrate that Carrieanne Bauer, who heard the statements made by Duncan, was unavailable to testify. Second, Duncan maintains that by allowing the detective to testify to Duncan's statements, the trial court permitted the State to present improper anticipatory rebuttal evidence of a mitigating circumstance, namely whether the defendant's ability to appreciate the criminality of his conduct was substantially impaired, for which no evidence had been or ever was presented. This anticipatory rebuttal allowed the State to present improper nonstatutory circumstances in aggravation. Duncan concludes that appellate counsel's failure to raise either of these claims on direct appeal constituted ineffective assistance.
This Court has held that "[t]o be preserved for appeal, `the specific ground upon which a claim is based must be raised at trial and a claim different than that will not be heard on appeal.'" Spann v. State, *829 857 So.2d 845, 852 (Fla.2003) (quoting Rodriguez v. State, 609 So.2d 493, 499 (Fla.1992)). Further, we have also held that "appellate counsel cannot be considered ineffective under [Strickland] for failing to raise issues that are procedurally barred because they were not properly raised during the trial court proceedings and do not present a question of fundamental error." Downs v. Moore, 801 So.2d 906, 910 (Fla.2001). In Knight v. State, 746 So.2d 423 (Fla.1998), Knight argued that his Confrontation Clause rights were violated when a detective who testified during his capital sentencing proceeding recounted a prior witness's sworn statement. See id. at 429-30. There, we held: "[B]ecause Knight never specifically objected to [the detective's] testifying as to the contents of the pilot's statement, we find this claim procedurally barred." Id. at 430.
In the instant case, defense counsel clearly objected to the State's line of questioning. However, the grounds raised for the objection were repetitiveness and leading; defense counsel did not object on the basis of double hearsay, anticipatory rebuttal, or the presentation of nonstatutory aggravation evidence. Pursuant to Spann, appellate counsel would only have been able to raise a claim on appeal, challenging the detective's testimony, based on one of the two grounds asserted during trial when defense counsel objected to the testimony. Duncan is now claiming appellate counsel was ineffective for failing to assert claims he was procedurally barred from bringing. As we held in Downs, appellate counsel could not have been ineffective for failing to raise issues that were procedurally barred.[9]

Claim 3: Failure to Challenge Reenactment of Murder by Witness
In Brown v. State, 550 So.2d 527 (Fla. 1st DCA 1989), the First District Court of Appeal held:
Demonstrative exhibits to aid the jury's understanding may be utilized when relevant to the issues in the case, but only if the exhibits constitute an accurate and reasonable reproduction of the object involved. The determination as to whether to allow the use of a demonstrative exhibit is a matter within the trial court's discretion.
Id. at 528 (citations omitted); see also Harris v. State, 843 So.2d 856, 864 (Fla.2003). The prosecutor in Brown used a knife and a Styrofoam head during his closing argument to depict the extent of a victim's stab wounds. See 550 So.2d at 528. There, the Fifth District concluded that the demonstrative exhibits were "sufficiently accurate replicas to be allowable within the court's discretion." Id. The court also noted that the record contained overwhelming evidence of the defendant's guilt that negated any reasonable possibility that the defendant's conviction resulted from the challenged demonstration. See id. at 529. As no fundamental error or undue prejudice was shown, the decision to allow the use of the demonstrative exhibits was within the trial court's discretion. See id.
Similarly, in the instant case, it was within the trial court's discretion to allow the use of a dummy as a demonstrative aid during one eyewitness's testimony. Richard Ferguson was Deborah Bauer's neighbor at the time of the offense. He witnessed the attack and notified police. He was the last witness called by the State *830 during the State's presentation of direct evidence, and after he detailed the attack, the prosecutor asked him to demonstrate what he had witnessed by utilizing a dummy. Defense counsel objected, arguing that the demonstration would be repetitive and inflammatory. The objection was overruled and the witness proceeded to demonstrate the attack, using himself in place of Duncan and the dummy as the victim.[10]
Duncan does not claim that the reenactment was inaccurate or not a reasonable reproduction of what occurred. He argues only that it was unnecessary to prove the State's case, and was repetitive in light of the three eyewitnesses' testimony and the medical examiner's autopsy photographs that had been introduced earlier, and therefore its prejudicial impact far outweighed its probative value. He relies upon two cases, Cave v. State, 660 So.2d 705 (Fla.1995), and Taylor v. State, 640 So.2d 1127 (Fla. 1st DCA 1994), to support his argument.
Duncan's reliance upon Cave and Taylor is misplaced. In Cave, this Court held that the use of a videotaped reenactment of the crime during resentencing was harmful error. See Cave, 660 So.2d at 708-09. We held that, under those circumstances, where guilt was not at issue, the use of the video reenactment was irrelevant, cumulative, and unduly prejudicial. See id. In the instant case, the eyewitness reenacted the attack during the prosecution's case-in-chief, when guilt or innocence had yet to be decided. Therefore, Cave and the instant case are distinguishable.
In Taylor, the state used, as a surrogate victim, a young woman of the same height, weight, general features, and coloring as the victim. See Taylor, 640 So.2d at 1132. Also, the court permitted the medical examiner to use clay heads to describe the impact and nature of the wounds that caused death. See id. The First District held that the use of both of these demonstrative aids was in error. See id. at 1134. Regarding the use of the clay heads, the court noted that there was no dispute as to the cause of death or the number of blows struck, and the feminine appearance of the heads was certain to evoke an emotional response in the minds of the jurors. See id. Further, the use of the exhibits had little or no bearing on the question for the jury, namely the issue of the defendant's sanity at the time of the offense. Similarly, the court held that the use of the surrogate victim had a tenuous relation to the relevant issue, and any probative value was outweighed by the prejudicial impact. See id. In the instant case, the relevant issue before the jury was whether Duncan was guilty of first-degree premeditated murder, and the demonstrative exhibit was utilized to show Duncan's actions during the course of the attack. Further, Duncan has made no claim that the appearance of the dummy was altered to resemble the victim and thereby evoke a more emotional action from the members of the jury.
Here, the use of the demonstrative exhibit falls squarely into the standard outlined in Brown. The dummy was used to aid the jury's understanding of a relevant issue, namely guilt, and there is no claim that the exhibit was not an accurate and reasonable reproduction of the attack. Therefore, the determination as to whether to allow the use of a demonstrative exhibit was a matter within the trial court's discretion. The judge did not abuse his discretion in allowing the use of *831 the demonstrative aid. Additionally, as in Brown, the overwhelming evidence of Duncan's guilt negates any reasonable possibility that his conviction resulted from the challenged demonstration. Strickland requires that Duncan show that counsel's performance was deficient and that the deficient performance resulted in prejudice to him. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Here, Duncan has failed to satisfy either prong. Duncan's claim is without merit, and appellate counsel was not ineffective for failing to raise a meritless claim. See Johnson v. Singletary, 695 So.2d 263, 267 (Fla.1996).

Claim 4: Cumulative Errors Resulted in Prejudice
Duncan's claim of cumulative error is without merit. As we have held that all of Duncan's individual claims are either procedurally barred or without merit, his cumulative claim must be denied. See Griffin v. State, 866 So.2d 1, 22 (Fla.2003) ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."); see also Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999).

Claim 5: Constitutionality of Florida's Death Penalty Statute
Duncan relies primarily on two cases to support his argument that Florida's death penalty statute is unconstitutional. In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the United States Supreme Court held that the jury must be fully advised of the importance of its role, and neither comments nor instructions may minimize the jury's sense of responsibility for determining the appropriateness of death. See id. at 341, 105 S.Ct. 2633. Duncan argues that the judge's instruction of "as you've been told, the final decision as to what punishment be [sic] imposed is the responsibility of the judge," violates the mandates of Caldwell. This argument is without merit. The judge's instruction is included in the standard jury instructions read prior to penalty phase jury deliberations. See Fla. Std. Jury Instr. (Crim.) 7.11. This Court has repeatedly held that "Florida's standard jury instructions fully advise the jury of the importance of its role and do not violate Caldwell." Sochor v. State, 619 So.2d 285, 291 (Fla.1993); see also Floyd v. State, 850 So.2d 383, 404 (Fla.2002).
Further, Duncan relies upon the United States Supreme Court's recent decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), to support his claim that Florida's death penalty statute is unconstitutional. This Court recently addressed Duncan's contention that the Florida death penalty scheme is unconstitutional in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. Duncan is likewise not entitled to relief on this claim. Additionally, even if Ring was applicable in Florida, Duncan would not be entitled to relief pursuant to that decision. Recently, in Doorbal v. State, 837 So.2d 940 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003), we held, "Because [the prior violent felonies] were charged by indictment, and a jury unanimously found Doorbal guilty of them, the prior violent felony aggravator alone clearly satisfies the mandates of the United States and Florida Constitutions, and therefore imposition of the death penalty was constitutional." Id. at 963. As in Doorbal, the death penalty was constitutionally imposed upon Duncan in light of the fact that the trial court properly applied the prior violent felony aggravating factor.

*832 Claim 6: Combination of Procedural and Substantive Errors Deprived Duncan of a Fundamentally Fair Trial and Direct Appeal
Duncan's final claim in his habeas petition is essentially a "kitchen sink" argument, in which Duncan is simply restating all the alleged errors that he previously claimed to have suffered during his trial and direct appeal. While he highlights that this Court held that it was error to admit a gruesome photograph of the 1969 murder victim during his penalty phase, we note that we held that error was harmless. See Duncan, 619 So.2d at 282. Having concluded that Duncan is entitled to a new penalty phase as a result of the ineffectiveness of his penalty phase counsel in failing to introduce available evidence in support of mental health mitigation, and further that none of the remaining individual claims of ineffective assistance of trial and appellate counsel asserted in Duncan's 3.850 motion and habeas petition have merit, we hold that Duncan's claim of cumulative error must fail. "[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail." Griffin v. State, 866 So.2d 1, 22 (Fla.2003); see also Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999).

CONCLUSION
In summary, we affirm the trial court's grant of a new penalty phase and denial of the remainder of the claims raised in Duncan's motion for postconviction relief, and further deny Duncan's petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs specially with an opinion.
ANSTEAD, J., specially concurring.
I concur fully in the majority opinion except for its discussion of the impact of the decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
NOTES
[1] Duncan was also charged with and convicted of the aggravated assault of Bauer's daughter, Carrieanne Bauer. He was sentenced to three and one-half years' imprisonment on the aggravated assault conviction. See Duncan, 619 So.2d at 281.
[2] Duncan did not challenge his convictions. However, this Court held that the trial record contained competent, substantial evidence to support the convictions. See Duncan, 619 So.2d at 281 n. 1.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[5] For ease of analysis, we have renumbered Duncan's numerous claims and subclaims raised in his cross-appeal. The ten claims asserted by Duncan are: (1) counsel was ineffective during the guilt phase for failing to investigate and present a voluntary intoxication defense; (2) counsel was ineffective during the guilt phase for conceding that Duncan was guilty of second-degree murder; (3) counsel was ineffective during the guilt phase for failing to object to the introduction and display of prejudicial photographs; (4) cumulatively, counsel's acts and omissions denied Duncan effective assistance of counsel during the guilt phase; (5) counsel's failure to introduce mitigating evidence of Duncan's good prison record during the penalty phase constituted ineffective assistance of counsel; (6) penalty phase counsel was ineffective for failing to challenge the prior violent felony aggravating factor by presenting evidence of the circumstances surrounding the 1969 murder; (7) cumulatively, counsel's acts and omissions denied Duncan effective assistance of counsel during the penalty phase; (8) the imposition of a sentence of death in the instant case is disproportionate, arbitrary, and disparate; (9) the rules prohibiting counsel from interviewing jurors violates Duncan's constitutional rights and deny him adequate assistance of counsel in pursuing his postconviction remedies; and (10) a combination of procedural and substantive errors deprived Duncan of a fundamentally fair capital trial and penalty phase guaranteed by the United States and Florida Constitutions.
[6] Again, we have renumbered the many claims and subclaims raised by Duncan in his habeas petition. The six claims argued are: (1) appellate counsel was ineffective for failing to raise an error based upon this Court's decision in Nixon v. State, 572 So.2d 1336 (Fla.1990); (2) appellate counsel was ineffective for failing to raise the reversible error caused by the introduction of improper evidence, namely double hearsay testimony; (3) appellate counsel was ineffective for failing to assert that Duncan's due process rights were violated when the State presented cumulative evidence of the crime by having a witness re-enact the murder using a dummy; (4) cumulatively, appellate counsel's errors resulted in prejudice to Duncan; (5) the death sentence here violates Duncan's rights under the United States Constitution because Duncan did not have a constitutional jury verdict on each element of the capital offense; and (6) the combination of procedural and substantive errors deprived Duncan of a fundamentally fair trial and direct appeal.
[7] Claim 1: see Pietri v. State, 29 Fla. L. Weekly, S440, S441-42 (Fla. Aug. 26, 2004); see Spencer v. State, 842 So.2d 52, 63 (Fla.2003); claim 2: see Jones v. State, 845 So.2d 55, 70-71 (Fla.2003); claim 3: see Philmore v. State, 820 So.2d 919, 930-31 (Fla.2002); claim 4: see Griffin v. State, 866 So.2d 1 (Fla.2003); and claim 9: see Arbelaez v. State, 775 So.2d 909, 920 (Fla.2000).
[8] Even if considered, this claim is meritless. "[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail." Griffin v. State, 866 So.2d 1, 22 (Fla.2003); see also Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999).
[9] Notably, Duncan has made no claim of fundamental error with respect to the detective's testimony.
[10] The record is silent regarding the appearance of the dummy used during the demonstration.